HELENE N. WHITE, Circuit Judge,
concurring.
I concur in all but Section II.C. of the majority opinion, as to which I write separately to identify two points of disagreement. I nevertheless concur in the ultimate conclusion of that section — that Plaintiffs had actual knowledge sufficient to trigger the statute of limitations.
I.
Plaintiffs argue that even after receiving the message from the Plan Administrator in the quarterly account statement for the period ending on September 30, 2000, and the September 29, 2000, letter from CEO Hiner, they still did not know that someone had discretionary oversight over the plans and could have worked to move their money from the OC Stock Fund sooner. They emphasize that the communications that explained the new rules on contributions to the OC Stock Fund relate to plan “amendment” rather than plan “management.” The majority rejects this argument as presenting a mere semantic difference, concluding that “[t]he communications informed Plan participants that someone had the authority to close the OC Stock Fund and to permit the participants to transfer prior contribu *577 tions.... They therefore knew that someone had the power to take steps to protect their Plan investments.” (Opinion at 570-71.)
I must disagree. After reviewing the communications, I see nothing in them indicating that a fiduciary, charged to protect Plan participants’ interests, was involved in the change in rules. The September 29th letter from CEO Hiner merely states that “the Compensation Committee of the Board of Directors has approved certain changes to your 401(k) Plan.” (App. 115.) Thus, it appears that the change was effected by OC, not the Plan administrator or anyone acting to protect the participants. And, even assuming that the “the Compensation and Benefits Call Center,” to which the letter directs any questions from Plan participants, is related to the Plan Administrator, the OC Benefits Review Committee, this provides no indication that the Plan Administrator played any role in bringing about the changes. Similarly, the “Message From The Plan Administrator” in the quarterly account statement at issue simply states the new status quo: “Effective September 29, 2000[,] the Owens Corning Stock fund was closed to any new contributions or transfers into the fund. Additionally, all company contributions that were previously restricted are now available to be transferred to any of the other investment options offered in the plan.” (App. 122.) These documents convey the message that Owens Corning alone had the authority to amend the plans, and that the company exercised that authority and then announced the unilateral change via the Plan Administrator. Thus, a plaintiff receiving this information would not necessarily have “kn[own] that someone had the power to take steps to protect their Plan investments.” (Opinion at 571.)
II.
The majority also concludes that the SPDs provided Plaintiffs with actual knowledge that someone had the power to take steps to protect their Plan investments. I find the record insufficient to establish such notice as a matter of law, especially as to the salaried employees.
The majority observes that “at least some participants were provided with access to the SPDs.” (Opinion at 571.) The evidence concerning Plaintiffs being provided SPDs comes primarily from the testimony of Richard Tober, head of Compensation and Benefits for OC. Tober testified that, with regard to hourly employees, SPDs were “periodically” mailed to participants, and that with regard to salaried employees, SPDs were “available online” and that their availability was “communicated to all employees.” (R. 134-2 at 12-13.) Tober also testified that “some were at plant locations that would have been available.” (R. 134-2 at 13.) In addition, one salaried-employee plaintiff said that she received a notice (apparently by email) about once a year that stated that a plan existed and “told you how to find the entire plan if you wanted to,” though the notice did not contain a link to the entire SPD and she never actually looked up the entire SPD. (R. 54-20 at 15-16.) The majority concludes that this is sufficient to establish that Plaintiffs had actual knowledge of the information contained in the SPDs: “we see no material distinction between being directly handed plan documents and being given instructions on how to access them.” (Opinion at 571.)
Although I agree with the majority that a plaintiffs failure to read an SPD furnished to him (or other types of willful blindness) do not prevent a plaintiff from having actual knowledge of the information in the SPD, the record does not adequately establish that the SPDs were furnished to *578 Plaintiffs. A helpful yardstick is provided by the ERISA statute and regulations that describe the publication and disclosure requirements that apply to SPDs. According to 29 U.S.C. § 1024(b),
Publication of summary plan descriptions and annual reports shall be made to participants and beneficiaries of the particular plan as follows:
(1) The administrator shall furnish to each participant, and each beneficiary receiving benefits under the plan, a copy of the summary plan description, and all modifications and changes referred to in section 1022(a)(1) of this title—
(emphasis added.) 29 C.F.R. § 2520 sheds some light on how an SPD must be “furnished” to a plan participant. See Leyda v. AlliedSignal, Inc., 322 F.3d 199, 208 (2d Cir.2003); Gertjejansen v. Kemper Ins. Companies, Inc., 274 Fed.Appx. 569, 570 (9th Cir.2008). The regulation provides that “the plan administrator shall use measures reasonably calculated to ensure actual receipt of the material by plan participants, beneficiaries and other specified individuals.” 29 C.F.R. § 2520.104b-1(b)(1). In particular, “[m]aterial which is required to be furnished to all participants covered under the plan ... must be sent by a method or methods of delivery likely to result in full distribution.” Id. This standard is high. For example,
in-hand delivery to an employee at his or her worksite is acceptable. However, in no case is it acceptable merely to place copies of the material in a location frequented by participants.... Material distributed through the mail may be sent by first, second, or third-class mail. However, distribution by second or third-class mail is acceptable only if return and forwarding postage is guaranteed and address correction is requested. Any material sent by second or third-class mail which is returned with an address correction shall be sent again by first-class mail or personally delivered to the participant at his or her worksite.
29 C.F.R. § 2520.104b-1(b)(1). With regard to electronic distribution, the administrator must
(i) take[] appropriate and necessary measures reasonably calculated to ensure that the system for furnishing documents—
(A) Results in actual receipt of transmitted information (e.g., using return-receipt or notice of undelivered electronic mail features, conducting periodic reviews or surveys to confirm receipt of the transmitted information)
29 C.F.R. § 2520.104b-1(c)(1)(i) & (i)(A). In addition, the plan administrator must ensure that
(iii) Notice is provided to each participant ... at the time a document is furnished electronically, that apprises the individual of the significance of the document when it is not otherwise reasonably evident as transmitted (e.g., the attached document describes changes in the benefits provided by your plan) and of the right to request and obtain a paper version of such document ...
29 C.F.R. § 2520.104b — 1(c)(1)(iii).
Thus, ERISA’s requirements for furnishing SPDs to plan participants are quite demanding. It would be strange, indeed, for a plaintiff in an ERISA suit to be understood to have actual knowledge of the information in an SPD that was not sufficiently furnished to the plaintiff under ERISA’s own standards. Because it is not clear from the record whether the ERISA requirements were met, I cannot conclude that there is no genuine issue whether Plaintiffs possessed actual knowledge of the information contained in the SPDs.
*579 III.
Despite the above observations, I agree with the result of the majority opinion. Even without the SPD information, Plaintiffs knew that they had investments that were protected by ERISA’s requirements. And, by October 2000 they knew about the bankruptcy and knew that OC stock was nearly worthless. They also knew that their investments had not been liquidated or moved to another fund before they had lost their value. I understand these facts to be the “facts ... that constituted the alleged violation” under this court’s standard as articulated in Wright v. Heyne, 349 F.3d 321, 330 (6th Cir.2003).